IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 1:20-cr-00174-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RYAN KAMADA,

    Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Bryan Fields, Assistant United States Attorney for the District of Colorado, and John P. Taddei, Trial Attorney for the Public Integrity Section of the U.S. Department of Justice Criminal Division (collectively, the "Government"), and the Defendant, RYAN KAMADA, personally and by and through his counsel, Michael L. Bender and T. Markus Funk, hereby submit the following Plea Agreement pursuant to D.C. COLO. LCR 11.1 and FED. R. CRIM. P. 11(c)(1)(A) and (B):

## I. AGREEMENT

    **A.**    **Defendant's Obligations**

    1.    The Defendant agrees to: (1) waive indictment; (2) plead guilty to an Information charging obstruction of proceedings before a department or agency of the

Court Exhibit

1

United States, a violation of Title 18, United States Code, Section 1505; (3) waive his appeal rights, as detailed below; (4) cooperate with state bar authorities, comply with any proposed sanctions from those authorities, and notify the bar authority of any other state in which he desires to practice law of those sanctions and this agreement.

### B.     Government's Obligations

2.     In exchange for the Defendant's plea of guilty and his waiver of appeal rights, the Government agrees to: (1) file no other federal criminal charges against the Defendant based on matters currently known to the Government or offenses based upon information provided by the Defendant; (2) recommend a three-level reduction for acceptance of responsibility, pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3E1.1, provided that the Defendant does not do anything that is inconsistent with accepting responsibility between and including the date of his guilty plea and the date of sentencing; and (3) recommend a sentence at the bottom of the U.S. Sentencing Guidelines range ultimately calculated by the Court. This agreement does not provide any limitation of liability arising out of any acts of violence.

### C.     Defendant's Waiver of Appeal

3.     The Defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the Government in this agreement, the Defendant knowingly and voluntarily waives the right to appeal any matter in connection with this

prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 16 (or, if the Defendant receives the three-level reduction for acceptance of responsibility, level 13), or (3) the Government appeals the sentence. Except as provided above, the Defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

4. The Defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. The Defendant specifically waives on appeal or in a collateral attack any argument that the admitted conduct does not fall within the scope of the statute. This waiver provision, however, will not prevent the Defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable Guidelines or sentencing statute, (2) there is a claim that the Defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the Government appeals the sentence imposed by the Court, the Defendant is released from this waiver provision. Should the plea of guilty be vacated on the motion of the Defendant, the Government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement.

## II. ELEMENTS OF THE OFFENSE

5.      The parties agree that the elements of the offense of obstruction of proceedings before a department or agency of the United States, a violation of 18 U.S.C. § 1505, are as follows:

   a.   *First,* that a proceeding was pending before a department or agency of the United States;

   b.   *Second*, that the Defendant was aware of the proceeding or the proceeding was foreseeable to the Defendant;

   c.   *Third,* that the Defendant corruptly and intentionally endeavored to influence, obstruct, or impede the proceeding;

   d.   *Fourth*, that the natural and probable effect of the Defendant's conduct was interference with the proceeding.[1]

## III. STATUTORY PENALTIES

6.      The maximum statutory penalties for violating 18 U.S.C. § 1505 are not more than 5 years' imprisonment; a fine of not more than $250,000; not more than 3 years of supervised release; and a $100 special assessment. If probation or supervised release is imposed, the Court may order restitution as a condition of probation or supervised release. The Government agrees that it will not seek an order of restitution as it is not warranted in this matter. A violation of supervised release or probation may result in a separate prison sentence and additional

---

[1] 18 U.S.C. § 1505; *see United States v. Phillips*, 583 F.3d 1261, 1263-66 (10th Cir. 2009) (interpreting 18 U.S.C. § 1512(c)(2)); U*nited States v. Townsend*, 630 F.3d 1003, 1014-15 (11th Cir. 2011) (interpreting 18 U.S.C. § 1512(c)(2)); *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006) (interpreting 18 U.S.C. § 1505).

4

supervision.

7. If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. COLLATERAL CONSEQUENCES

8. The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

9. The parties agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to this Plea Agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory Guidelines range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of this Plea Agreement.

10. This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree as follows:

11. The relevant conduct in this case began in April 2019 and ended in July 2019. Unless otherwise stated, the conduct below took place in Weld County, Colorado, which is in the State and District of Colorado.

**The Defendant's Associations with Geoffrey Chacon and Drug Dealer**

12. The Defendant, Defendant's acquaintance ("Drug Dealer"), and Geoffrey Chacon ("Chacon") all grew up in the same community in northern Colorado and were familiar with each other since youth.

13. The Defendant has known Chacon's family his entire life and Chacon has been the Defendant's best friend since 2015. For the past several years, the Defendant and Chacon either spoke on the phone, exchanged text messages, spent time together doing family activities, or saw each other in person on a daily basis.

14. The Defendant has known Drug Dealer through high school, through mutual friends in their community, and then through various community organizations in which they were both members. Drug Dealer, who held himself out as a "philanthropist" and maintained relationships with various prominent political and social figures in their small Northern Colorado town, was a prominent member of their community. The Defendant had Drug Dealer's personal cell phone number, which Defendant had received while jointly serving on the board of directors for Weld County Latino Chamber of Commerce with Drug Dealer. The Defendant was also "friends" with Drug Dealer (along with hundreds of other friends from his youth) on the social media platform Facebook. Defendant and Drug Dealer, however, were not

6

personal friends and did not socialize one-on-one.

15. At all times relevant to this plea agreement, the Defendant was aware of wide-spread rumors in the community that Drug Dealer was involved in the illegal distribution of controlled substances. The Defendant also knew that Drug Dealer was reputed to be involved in other criminal activity. After the legalization of marijuana in Colorado, the Defendant heard rumors that Drug Dealer was involved in the legal marijuana business. Drug Dealer's reputation as a cocaine dealer was also suspected within the Defendant and Chacon's community. The Defendant had heard that Drug Dealer was a "scary guy;" and the Defendant's father had warned Defendant to stay away from Drug Dealer.

16. In addition, the Defendant, Chacon, and others exchanged messages joking about Drug Dealer's cocaine business (Drug Dealer was not part of their collective social circle). For example, on January 31, 2019, Chacon sent a picture of a wrapped package of meat that resembled a brick of cocaine. The Defendant responded, "Looks like [Drug Dealer's] kitchen with cocaine."

17. On January 27, 2019, the Defendant exchanged text messages with Chacon about an altercation between Drug Dealer and a second drug dealer. Chacon told the Defendant that the two Drug Dealers "got into a fight" and that the second drug dealer "was all drunk n high on coke." The Defendant responded that the second drug dealer "[n]eeds to grow up" and "[i]f he wants to play big boy stuff, then he needs to be a big boy." Chacon responded, "Yeah bro, lol he is a fuckin idiot man. He [the second drug dealer] owes him [Drug Dealer] Like 15 g's worth of cash."

The Defendant said, "One thing I've learned. [The second drug dealer] is not a good criminal. He needs to get a normal job." Chacon responded that the second drug dealer "is possibly the stupidest drug dealer I've seen/heard of."

**The Defendant's Obstruction of the WCDTF Investigation**

18. From in or around January 2019 through in or around August 2019, the Defendant served as a District Court Judge of the 19th Judicial District of Colorado.

19. On or about April 23, 2019, the Defendant was the "on call" judge for the 19th Judicial District. At approximately 10:00 p.m., a Weld County Drug Task Force (WCDTF)[2] Task Force Officer (TFO) contacted the Defendant regarding a search warrant for a covert tracking device related to an ongoing investigation into Drug Dealer and his confederates. While speaking to the Defendant, the WCDTF TFO relayed her knowledge that the Defendant was associated through social media with Drug Dealer, who was one of the subjects referenced in the warrant. During their

---

[2] The WCDTF was a federally funded law enforcement group that included local police officers — designated as federal TFOs — and Drug Enforcement Administration ("DEA") Special Agents. The DEA is a federal agency within the Department of Justice. In October 2018, the WCDTF began investigating the suspected drug trafficking activity of a wholesale drug dealer, referred to in this agreement as "Drug Dealer," and his confederates. The investigation revealed a large-scale drug trafficking organization ("DTO") that was distributing distribution-level quantities of cocaine throughout northern Colorado, namely Greeley, Evans, Loveland, and Longmont. Drug traffickers based in Mexico were directly supplying the DTO with cocaine manufactured in Mexico. During the investigation, the WCDTF implemented several techniques to investigate the organization including, but not limited to, warrants to place tracking devices on vehicles used by the DTO and wiretaps of phones used by Drug Dealer. The Defendant, at the time, had no knowledge of this investigation or of any details relating to Drug Dealer's activities. Rather, Defendant was aware of Drug Dealer's reputation in the community as a drug dealer, local philanthropist, and businessman.

brief conversation, the Defendant verified that he was acquainted with Drug Dealer and stated that he previously had contact with Drug Dealer. As a result, the Defendant decided to recuse himself and asked the WCDTF TFO to submit the warrant to a different judge. The Defendant never reviewed, read, or viewed the subject search warrant.

20. The next morning, April 24, 2019, at approximately 6:56 a.m., the Defendant called Chacon. During the call, the Defendant told Chacon, among other things, that he had received a call from a law enforcement officer regarding a warrant, which the Defendant referred to as a warrant for a type of "tracker." The Defendant recounted that he had recused himself because the warrant referred to Drug Dealer. The Defendant explained, however, that law enforcement was "watching" Drug Dealer's house, car, and phone, facts that the Defendant, at the time, believed he was making up, even though it later emerged that some of them were accurate. The Defendant made these details up in order to get Chacon's attention and ensure that Chacon took the Defendant seriously.

21. The Defendant then told Chacon to "stay away" from Drug Dealer. Prior to the call, the Defendant had expressed displeasure with Chacon's continued association with Drug Dealer and had warned that Chacon's casual association with Drug Dealer could cause him problems one day and was a "bad idea." More specifically, the Defendant had witnessed fights between Chacon and Chacon's wife (the two families were close) because Chacon's wife believed that Chacon spent time with Drug Dealer; Drug Dealer had an earned reputation for being a womanizer

and "shady character." The Defendant had also told Chacon that his association with Drug Dealer could tarnish Chacon's reputation as a recently minted school principal. Finally, the Defendant, who at the time served as a personal and professional mentor to Chacon, was worried that, because of Chacon's past questionable associations and bad decisions (including reported cocaine use when Chacon was in high school), Chacon might have fallen, or could fall, into bad habits, including drug use and adultery.

22.     The Defendant shared this sensitive non-public information with Chacon because he knew that law enforcement was likely investigating Drug Dealer's activities.  While motivated in large part to protect his friend Chacon from reputational harm, the Defendant was also motivated to protect Chacon from potential criminal legal exposure flowing from Chacon's relationship and potential unlawful dealings with Drug Dealer.  His sharing of the information was thus done intentionally and corruptly.

23.     Unbeknownst to the Defendant, Chacon shared the information the Defendant provided to him concerning the investigation with Drug Dealer. The Defendant now understands that Drug Dealer, in turn, asked Chacon to see if he could get additional information out of the Defendant. The Defendant had no further information about the warrant or knowledge of the investigation, but, in order to appear knowledgeable or "plugged in," invented certain additional facts. For example, the Defendant told Chacon that the investigation was ongoing and explained that the warrant for Drug Dealer's phone had to be renewed after periods

10

of time. The Defendant fabricated this information. In fact, the Defendant had no additional contact with, nor information about, the investigation's status, objectives, or modalities.

24. On another occasion, the Defendant communicated with Chacon through an online Xbox video game. The Defendant and Chacon would play Xbox games multiple times per week. During their in-game discussion, Chacon again asked the Defendant about the investigation. The Defendant, again having no additional knowledge of the investigation or further contact with law enforcement involved in the investigation, once again responded with made-up information. Specifically, the Defendant falsely claimed that he had been at a lunch with other judges in the district and had been informed that investigators were pursuing the investigation "the old school way" and that "people are flipping." The Defendant further asserted that this meant that subjects of the investigation were cooperating with law enforcement by providing information about the drug-trafficking activities of their confederates. The Defendant was, in fact, lying to Chacon: he had not heard anything further about the warrant or investigation from another judge or by any other means. Rather, the Defendant's universe of knowledge concerning the investigation was based on his minutes-long April 23, 2019 phone conversation with the TFO. But it appeared to the Defendant that Chacon believed these "facts" the Defendant provided were true.

25. Unbeknownst to the Defendant, but known by the Government, the information the Defendant provided to Chacon (both the initial true information about

law enforcement attention, as well as the made-up information provided thereafter) caused Chacon and Drug Dealer to change their patterns of conduct and interfered with the WCDTF's investigation. Chacon modified his behavior to reduce his contacts with Drug Dealer and his confederates, including by physically distancing himself and by instructing an associate of Drug Dealer to correspond with Chacon using their work phones rather than their personal phones based on Chacon's concern that law enforcement was monitoring Chacon's personal cell phone.

26. Defendant was not, and had not been, in any form of contact with Drug Dealer concerning the investigation or anything else. While the Defendant assumed Chacon would not share this sensitive information with the Drug Dealer or anyone else, the Defendant's sharing of this highly-sensitive information was inappropriate and reckless, and the Defendant reasonably should have foreseen that, given Chacon's known acquaintance with Drug Dealer, Chacon would share this information with him. The Government has informed defendant that, as a result of being "tipped" by Chacon, Drug Dealer slowed down the pace of his drug operation in an effort to divert law enforcement's attention from his activities and "cleaned" his house of evidence relating to drug activities. The Government further has informed the Defendant that, as a result, when WCDTF officers executed a search at Drug Dealer's house on May 15, 2019, they found no evidence related to Drug Dealer's illicit drug activities. That said, both Drug Dealer and Chacon were ultimately arrested and pleaded guilty to a variety of offenses.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

27. The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory Guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.

28. The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand the government has an independent obligation to assist the court in making an accurate determination of the correct guideline range, which means that the government is not precluded from making arguments in support of or against any estimate of the guideline range independently calculated by the Probation Office. *See United States v. Aragon*, 922 F.3d 1102, 1109 (10th Cir. 2019). To that end, the government, just like the Defendant, may make factual or legal arguments that affect the estimate below.

    A.    Pursuant to U.S.S.G. § 2J1.2(a), the base offense level is 14;

    B.    Pursuant to U.S.S.G. § 3B1.3, the Defendant should receive a two-level enhancement for abusing his judicial office, which was a position of trust.

    C.    The adjusted offense level is therefore 16.

    D.    <u>Acceptance of Responsibility</u>:  Provided the Defendant does nothing

inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the Defendant should receive a 2-level downward adjustment, pursuant to U.S.S.G §§ 3E.1.1(a). If the Defendant has accepted responsibility as described above, and the Defendant's offense level is sixteen (16) or greater, the United States agrees that an additional 1-level reduction would be appropriate, pursuant to § 3E1.1(b) of the Sentencing Guidelines, because the Defendant has assisted authorities by providing timely notice of the Defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the Court to allocate its resources efficiently. The resulting offense level would be 13.

      E.    <u>Criminal History Category</u>: The parties understand that the Defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the Defendant's prior convictions. Based on information currently available to the parties, it is estimated that the Defendant's criminal history category would be **Category I,** as the Defendant has no criminal history.

      F.    Assuming the (tentative) criminal history set forth above, the career offender/criminal livelihood/armed career criminal adjustments pursuant to U.S.S.G. § 4B1.1 - § 4B1.4 would not apply.

      G.    <u>Imprisonment</u>: The advisory guideline range resulting from these calculations — an offense level of 13 at Criminal History Category 1 — is 12-18 months of imprisonment. However, in order to be as accurate as possible, with the

criminal history category undetermined at this time, the estimated offense level of 16 set forth above could conceivably result in a range from 12 months (bottom of Category I), to 41 months (top of Category VI).

       H.      <u>Fine</u>: The Government will not seek a fine in this case. However, the parties understand that pursuant to U.S.S.G. § 5E1.2, assuming the estimated offense level of 13 set forth above, the fine range for this offense would be $5,500 to $55,000, plus applicable interest and penalties and the Court may impose a fine.

       I.      <u>Supervised Release</u>: Pursuant to U.S.S.G. § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year but not more than 3 years.

       J.      <u>Restitution</u>: The parties understand that, while the Government is not seeking restitution in this matter, pursuant to 18 U.S.C. §§ 3563(b) and 3583(d), the Court may impose restitution as a condition of probation or supervised release in an amount to be determined by the Court.

      29.      The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

      30.      No estimate by the parties regarding the guideline range precludes the Defendant from asking the Court to vary entirely from the advisory Guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

31.     The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory Guidelines (in length or form), within the advisory Guidelines range, or above the advisory Guidelines range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

32.     This Plea Agreement states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this Plea Agreement, neither the Government nor the Defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: June 19 2020

RYAN KAMADA
Defendant

Date: 6/18/2020

s/ Michael L. Bender
Michael L. Bender, Esq.
Attorney for Defendant

Date: 6/18/2020

s/ T. Markus Funk
T. Markus Funk, Esq.
Attorney for Defendant

Date: 06/23/2020

/s Bryan David Fields
Bryan David Fields
Assistant United States Attorney

Date: 06/23/2020

/s John P. Taddei
John P. Taddei
Trial Attorney

17