# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 19-cr-00415-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GEOFFREY CHACON,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Bryan Fields, Assistant United States Attorney for the District of Colorado, and John P. Taddei, Trial Attorney for the Public Integrity Section of the U.S. Department of Justice Criminal Division (collectively, (the "Government"), and the Defendant, GEOFFREY CHACON, personally and by and through his counsel, Rick Kornfeld and David Beller, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCRR 11.1 and FED. R. CRIM. P. 11(c)(1)(A) and (B):

### I. AGREEMENT

**A.**     **Defendant's Obligations:**

1.     The Defendant agrees to (1) waive indictment, (2) plead guilty to an Information charging destruction of records in a Federal investigation, a violation of Title 18, United States Code, Section 1519, and (3) waive his appeal rights, as detailed below.

1

COURT EXHIBIT
1

**B. Government's Obligations**

2.      In exchange for the Defendant's plea of guilty and his waiver of appeal rights, the Government agrees to (1) file no other federal criminal charges against the Defendant based on matters currently known to the Government or offenses based upon information provided by the Defendant, and (2) recommend a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, provided that the Defendant does not do anything that is inconsistent with accepting responsibility between and including the date of his guilty plea and the date of sentencing.

**C. Defendant's Waiver of Appeal**

3.      The Defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.   Understanding this and in exchange for the concessions made by the Government in this agreement, the Defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 17 (or, if the Defendant receives the three-level reduction for acceptance of responsibility, level 14); or (3) the Government appeals the sentence.   Except as provided above, the Defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

4.      The Defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.   The Defendant specifically waives on appeal or in a collateral attack any argument that the admitted conduct does not fall within the scope of the statute.   This waiver provision, however, will not prevent the Defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the Defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.   Additionally, if the Government appeals the sentence imposed by the Court, the Defendant is released from this waiver provision.   Should the plea of guilty be vacated on the motion of the Defendant, the Government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement.

### D.      The Defendant's Cooperation Agreement

5.      The Defendant agrees to provide truthful, complete and accurate information, and agrees to cooperate fully with the Government.   The Defendant's full cooperation shall include cooperating with any state and local governments when the Government so requests.   Deliberate falsehoods or misinformation provided during his cooperation with the Government would be grounds for rescission of this plea agreement as well as possible further prosecution for perjury or false statements.   This cooperation will include, but is not limited to, the following:

a.               The Defendant agrees to be fully debriefed, and to attend all

3

meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities;

b.        The Defendant agrees to furnish to the Government all non-privileged documents and other material that may be relevant to the investigation and that are in the Defendant's possession or control;

c.        The Defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the Government, including in any state, local or administrative proceeding;

d.        The Defendant agrees that he will at all times give complete, truthful and accurate information and testimony and that he will fully and truthfully disclose all information with respect to the activities of himself and others concerning all matters about which the Government inquires;

e.        The Defendant consents to postponements of his sentencing, as requested by the Government and as approved by the Court.   Should the Defendant be required to provide testimony at a time subsequent to his sentencing in this case and should the Defendant fail, at a later date, to comply with the obligation to testify, the Government could seek to recharge him on any and all counts which were dismissed as part of this plea agreement.

6.      The parties understand that the Government's determination of whether the Defendant has cooperated fully and provided substantial assistance and the Government's assessment of the value, truthfulness, completeness, and accuracy of the cooperation, are within the Government's sole discretion.   Moreover, the Defendant shall not be entitled to withdraw his plea if the Government determines that he has not fully cooperated.   The Defendant's full cooperation, in the form of proffers and testimony, if required, has not yet been completed.   The parties understand and agree that the determination of whether or not the Defendant has fully cooperated in compliance with the terms of this plea agreement and whether to file a motion under Section 5K1.1 are entirely within the discretion of the Government.

4

7.      The parties recognize that any sentence requested by the Government will be a recommendation to the Court and that the Defendant's ultimate sentence will rest solely within the discretion of the sentencing Court.

8.      The Defendant also acknowledges that he will not be able to withdraw his guilty plea in the event that the Court elects not to grant any downward departure pursuant to the request made by the Government or rejects the amount of the departure requested by the Government.

9.      The Defendant may not contest the Government's ultimate determination as to whether a § 5K1.1 motion is appropriate in this case.   The Government has not promised a reduction or the amount of any reduction.   Again, the Defendant understands he will not receive any reduction if he refuses to provide complete and true information to the Government and to testify truthfully in any proceeding.

## II. ELEMENTS OF THE OFFENSE

10.      The parties agree that the elements of the offense of destroying records in a Federal investigation, a violation of 18 U.S.C. § 1519, are as follows:

a.      *First,* that the Defendant knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in any record, document or tangible object;

b.      *Second*, that the Defendant acted with the intent to impede, obstruct, or influence the investigation or proper administration of any matter, or in contemplation of or in relation to any matter;

c.      *Third,* that the matter was within the jurisdiction of a department or agency of the United States.[1]

---

[1] *See United States v. Yielding*, 657 F.3d 688, 710-715 (8th Cir. 2011).

5

### III. **STATUTORY PENALTIES**

11.     The maximum statutory penalties for violating 18 U.S.C. § 1519 are not more than 20 years' imprisonment; a fine of not more than $250,000; not more than 3 years of supervised release; and a $100 special assessment.   If probation or supervised release is imposed, the Court may order restitution as a condition of probation or supervised release.   The Government agrees that it will not seek an order of restitution as it is not warranted in this matter.   A violation of supervised release or probation may result in a separate prison sentence and additional supervision.

12.     If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

### IV. **COLLATERAL CONSEQUENCES**

13.     The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V. **STIPULATION OF FACTS**

14.     The parties agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to this Plea Agreement.   That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are

known to be in dispute at the time of the execution of this Plea Agreement.

15.     This stipulation of facts does not preclude either party from hereafter

presenting the Court with additional facts that do not contradict facts to which the parties

have stipulated and that are relevant to the Court's guideline computations, to other 18

U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree as follows:

16.     The relevant conduct in this case began in October 2018 and ended in

July 2019.   Unless otherwise stated, the conduct below took place in Weld County,

Colorado, which is in the State and District of Colorado.

**The Weld County Drug Task Force's Investigation of a Matter Within the Jurisdiction of the Drug Enforcement Administration and the Federal Bureau of Investigation**

17.     The Federal Bureau of Investigation ("FBI") was a federal agency within

the Department of Justice with authority to investigate, among other matters, violations

of the Federal Controlled Substances Act, statutes related to the obstruction of criminal

investigations and prosecutions, and the making of false statements.

18.     The Weld County Drug Task Force ("WCDTF") was a federally funded law

enforcement group that included local police officers — designated as federal task force

officers ("TFO") — and Drug Enforcement Administration ("DEA") Special Agents.   The

DEA, like the FBI, is a federal agency within the Department of Justice.

19.     In October 2018, the WCDTF began investigating the suspected drug

trafficking activity of a wholesale drug dealer, referred to in this agreement as DRUG

DEALER, and his confederates.   The investigation revealed a large-scale drug

7

trafficking organization ("DTO") that was distributing large quantities of cocaine throughout northern Colorado, namely Greeley, Evans, Loveland, and Longmont. Drug traffickers based in Mexico were directly supplying the DTO with cocaine manufactured in Mexico. During the investigation, the WCDTF implemented several techniques to investigate the organization including, but not limited to, warrants to place tracking devices on vehicles used by the DTO and wire taps of phones used by DRUG DEALER.

**The Defendant's Purchases of Cocaine from DRUG DEALER**

20.     The Defendant and DRUG DEALER are of similar age. They first met when the Defendant was a child and the Defendant began regularly associating with DRUG DEALER as an adult. DRUG DEALER was the Defendant's source for purchasing cocaine, which the Defendant used recreationally. To coordinate these purchases, the Defendant used his telephone to exchange text messages with DRUG DEALER:

a.     On October 5, 2018, the Defendant texted DRUG DEALER to ask if DRUG DEALER could "Spot me a bag unit I get paid for reffin [refereeing]." DRUG DEALER replied, "I got u Bro." The reference to a "bag," was a reference to a bag containing user amounts of cocaine.

b.     On October 6, 2018, the Defendant texted DRUG DEALER, "What up bruh, [my wife's brother] wants to snag a $40 if it's coo…he just dropped off cash to me[]." DRUG DEALER replied, "k." The Defendant owed DRUG DEALER money for the bag that DRUG DEALER had provided him the day before. As a result, the Defendant pretended that the cocaine was for his wife's brother so that DRUG DEALER would provide the Defendant with another user amount of cocaine instead of asking him to pay off the debt.

c.     On November 1, 2018, the Defendant texted DRUG DEALER, "Do you have any bumps on you g." A "bump" is a user amount of cocaine. DRUG DEALER replied, "I got $60 for you ese."

8

d.      On November 11, 2018, the Defendant texted DRUG DEALER, "Can I Venmo you and snag some in the a.m."   The Defendant's reference to "some" was a reference to buying some cocaine.   Venmo is an internet application that allows users to transfer money to one another.

e.      On December 7, 2018, the Defendant arranged a meeting with DRUG DEALER to "have a snow storm," meaning to use cocaine together.   Later the same day, the Defendant told DRUG DEALER that he would meet him at DRUG DEALER's office, where DRUG DEALER often sold drugs.

**The Defendant's Obstruction of the WCDTF and FBI Investigations**

21.      The Defendant was close personal friends with a District Court Judge of the 19th Judicial District of Colorado, hereinafter referred to as JUDGE.   JUDGE was "friends" on the social media platform Facebook with both the Defendant and DRUG DEALER.

22.      On or about April 23, 2019, JUDGE was the "on call" judge for the 19th Judicial District.   At approximately 10:00 p.m., a WCDTF TFO contacted JUDGE regarding a search warrant for a covert tracking device related to the ongoing investigation into DRUG DEALER and his confederates.   While speaking to JUDGE, the WCDTF TFO relayed her knowledge that JUDGE was associated through social media with DRUG DEALER, who was one of the subjects referenced in the warrant. JUDGE verified his relationship with DRUG DEALER and stated that he remained in contact with DRUG DEALER.   As a result, JUDGE recused himself and asked the WCDTF TFO to submit the warrant to a different judge.

23.      The next morning, April 24, 2019, at approximately 6:56 a.m., JUDGE called the Defendant.   Although the Defendant and JUDGE communicated with one another regularly, the early-morning timing of this call was unusual.   During the call,

9

JUDGE told the Defendant, among other things, that he had received a call from a female law enforcement officer regarding a warrant, which JUDGE referred to as a warrant for a type of tap or tracker.   JUDGE recounted that he had declined to sign the warrant because it referred to DRUG DEALER.   However, JUDGE explained that he had received the warrant and told the Defendant that law enforcement was watching DRUG DEALER's house, car and phone.   JUDGE told the Defendant to stay away from DRUG DEALER.   The Defendant understood that JUDGE was warning him to stay away from DRUG DEALER so that the Defendant would not become a subject of the law enforcement investigation.

24.     Later on April 24, 2019, after receiving the call from JUDGE, the Defendant tried to warn DRUG DEALER of the investigation by conveying the substance of the Defendant's conversation with JUDGE through the Defendant's cousin, who was also friends with DRUG DEALER.   The Defendant told his cousin that police were watching DRUG DEALER's house, car and phone and that he had received this information from JUDGE.   However, the Defendant told his cousin not to refer to JUDGE as the source.

25.     On May 3, 2019, the Defendant and one of the Defendant's friends met DRUG DEALER, who was also with a group of friends, outside of a bar near the Eighth Street Plaza in downtown Greeley, Colorado.   After the initial meet up, the Defendant and DRUG DEALER handed their cell phones to a friend and split off from the group so that they could converse in private without fear that the meeting would be recorded on one of the phones.   Eventually, they got into the front seat of DRUG DEALER's car,

10

which was parked nearby.   While inside the car, the Defendant told DRUG DEALER the information he had received from JUDGE.

26.     After the May 3, 2019 meeting with DRUG DEALER, the Defendant asked JUDGE for more information about the status of the WCDTF's investigation.   JUDGE told the Defendant that the investigation was ongoing and explained that the warrant for DRUG DEALER's phone had to be renewed after periods of time.   On another occasion, the Defendant communicated with JUDGE through an online Xbox video game.   During their in-game discussion, the Defendant again asked JUDGE about the investigation.   JUDGE responded that he had been at a lunch with other judges in the district and had been informed that investigators were pursuing the investigation "the old school way" and that "people are flipping."   JUDGE further explained that this meant that subjects of the investigation were cooperating with law enforcement by providing information about the drug-trafficking activities of their confederates.

27.     While the defendant does not have personal knowledge of the effects of his conduct on the investigation, he stipulates and agrees that the government would show with admissible and credible evidence, beyond a reasonable doubt, that the information the Defendant provided to DRUG DEALER caused DRUG DEALER to change his pattern of conduct and substantially interfered with the WCDTF's investigation.   DRUG DEALER began using a different vehicle and a different phone. DRUG DEALER also slowed down the pace of his drug operation in an effort to divert law enforcement's attention from his activities.   Furthermore, DRUG DEALER cleaned his house of any evidence relating to his drug activities.   As a result, when WCDTF

11

officers executed a search at DRUG DEALER's house on May 15, 2019, they found no evidence related to DRUG DEALER's illicit drug activities. DRUG DEALER also scrubbed other sites of evidence, including the office he used to conduct many of his drug deals. The result was that a search warrant executed at DRUG DEALER's office was similarly unsuccessful at obtaining evidence.

28. After the Defendant relayed the information he received from JUDGE to DRUG DEALER, the Defendant destroyed records of his communications with DRUG DEALER — namely, the texts between himself and DRUG DEALER — to impair efforts by law enforcement to tie him to DRUG DEALER. The deleted texts included the texts referenced above in paragraph 20 and texts between the Defendant and JUDGE referencing DRUG DEALER. The Defendant destroyed these records by searching for DRUG DEALER's name in his phone and deleting all text messages in which DRUG DEALER's name appeared or was mentioned. The Defendant did this because he knew that the FBI, the DEA and local law enforcement could all be investigating DRUG DEALER's activities and relationship with the Defendant, all of which would result in state or federal prosecution.

29. Although the FBI and the WCDTF were able to retrieve some of the deleted messages from other sources, not all of the destroyed text messages have been recovered. The Defendant's destruction of those records thus substantially hampered those agencies' ability to gather evidence related to JUDGE's decision to disclose the existence of an ongoing investigation and to determine whether JUDGE

has made false statements to investigators, which is conduct within the jurisdiction of the FBI and the WCDTF.

### VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

30.     The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553.   In determining the particular sentence to be imposed, the Court is required to consider seven factors.   One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission.   In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.   To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A.     Pursuant to U.S.S.G. § 2J1.2(a), the base offense level is 14;

B.     Pursuant to U.S.S.G. § 2J1.2(b)(2), the Defendant should receive a three-level enhancement because the offense resulted in substantial interference with the administration of justice;

C.     The Adjusted Offense Level is therefore **17**.

D.     Acceptance of Responsibility:   Provided the Defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the Defendant should receive a 2-level downward adjustment, pursuant to U.S.S.G §§ 3E.1.1(a).   If the Defendant has accepted responsibility as described above, and the Defendant's offense level is sixteen (16) or greater, the United States agrees that an additional 1-level reduction would be

13

appropriate, pursuant to § 3E1.1(b) of the Sentencing Guidelines, because the Defendant has assisted authorities by providing timely notice of the Defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the Court to allocate its resources efficiently. The resulting Offense Level would be **14.**

  E. <u>Criminal History Category</u>: The parties understand that the Defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the Defendant's prior convictions. Based on information currently available to the parties, it is estimated that the Defendant's criminal history category would be **Category I,** as the Defendant has no criminal history.

  F. Assuming the (tentative) criminal history set forth above, the career offender/criminal livelihood/armed career criminal adjustments pursuant to U.S.S.G. § 4B1.1 - § 4B1.4 would not apply.

  G. <u>Imprisonment</u>: The advisory guideline range resulting from these calculations — an offense level of 14 at Criminal History Category 1 — is 15 to 21 months of imprisonment. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level of 14 set forth above could conceivably result in a range from 15 months (bottom of Category I), to 46 months (top of Category VI).

  H. <u>Fine</u>: The Government will not seek a fine in this case. However, the parties understand that pursuant to U.S.S.G. § 5E1.2, assuming the estimated offense level of 14 set forth above, the fine range for this offense would be $7,500 to $75,000,

14

plus applicable interest and penalties and the Court may impose a fine.

I.    Supervised Release: Pursuant to U.S.S.G. § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year but not more than 3 years.

J.    Restitution: The parties understand that, while the Government is not seeking restitution in this matter, pursuant to 18 U.S.C. §§ 3563(b) and 3583(d), the Court may impose restitution as a condition of probation or supervised release in an amount to be determined by the Court.

31.    The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range.   In doing so, the Court is not bound by the position of any party.

32.    No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines.   Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

33.    The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may

be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VI. ENTIRE AGREEMENT

34. This Plea Agreement states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, Government nor the Defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 11-21-19

GEOFFREY CHACON
Defendant

Date: 11-21-19

Richard Kornfeld, Esq.
Attorney for Defendant

Date: 11.19.19

David Beller, Esq.
Attorney for Defendant

Date: 11/21/19

Bryan David Fields
Assistant United States Attorney

Date: 11/21/19

John P. Taddei
Trial Attorney

16