**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cr-00174-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

RYAN KAMADA,

       Defendant.

---

**DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

---

# TABLE OF CONTENTS

**Page**

I.    STANDARD OF REVIEW ................................................................... 2

II.    LEGAL ARGUMENT ...................................................................... 3

    A.    Ryan's History and Characteristics ................................................ 3

        1.    Ryan's Upbringing and Family Background.......................... 4

        2.    Community Service ............................................................ 5

        3.    Ryan's Career ................................................................... 5

        4.    Ryan's Cooperation with the Government ............................ 6

    B.    The Nature and Circumstances of the Offense .................................. 7

        1.    It Is Undisputed That Ryan Intended No Harm and at No Time Expected His Information to Be Shared with Anyone Other Than Chacon.................................................................. 7

        2.    Ryan's Relationship with – and Loyalty to – His Best Friend Geoff Chacon Was a Critical Factor in His Downfall............................ 8

    C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for Law, and Provide Just Punishment for the Offense .............................................................. 11

    D.    The Need to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant........................... 12

        1.    General Deterrence ............................................................. 12

        2.    Specific Deterrence............................................................ 13

    E.    The Kinds of Sentences Available ................................................. 13

    F.    The Global Pandemic, Coupled with Ryan's Medical Condition, Reinforces the Necessity for a Non-Custodial Sentence ................................. 14

    G.    The Court Should Not Impose a Fine............................................ 15

III.    CONCLUSION ............................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gall v. United States*,
    552 U.S. 38 (2007) .................................................................................2, 13, 14

*Pepper v. United States*,
    562 U.S. 476 (2011) ....................................................................................2, 3

*United States v. Atl. States Cast Iron Pipe Co.*,
    627 F. Supp .2d 180 (D.N.J. 2009).................................................................10

*United States v. Barnes*,
    890 F.3d 910 (10th Cir. 2018) ..................................................................2, 11

*United States v. Bishop*,
    493 F. App'x 984 (10th Cir. 2012) (unpublished)..........................................10

*United States v. Booker*,
    543 U.S. 220 (2005) .........................................................................................2

*United States v. Courtney*,
    76 F. Supp. 3d 1267 (D.N.M. 2014)..............................................................12

*United States v. Doe*,
    218 F. App'x 801 (10th Cir. 2007)...................................................................7

*United States v. Fernandez*,
    443 F.3d 19 (2d Cir. 2006) ..............................................................................7

*United States v. Gray*,
    692 F.3d 514 (6th Cir. 2012) .........................................................................10

*United States v. Houtar*,
    980 F.3d 268 (2d Cir. 2020) ..........................................................................10

*United States v. Perry*,
    473 F. Supp. 3d 1250 (D. Colo. 2020) ...........................................................15

**STATUTES**

18 U.S.C. § 3553(a)...........................................................................1, 2, 3, 7

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

18 U.S.C. § 3553(a)(2)(A)-(D) ................................................................................................. 2

U.S.S.G. § 1B1.13 ............................................................................................................... 15

U.S.S.G. § 5A, 5B1, and 5C1 ............................................................................................. 13

U.S.S.G. § 5E1.2(a) ........................................................................................................... 15

**RULES**

Local Criminal Rule 32.1(c) ............................................................................................... 1

**OTHER AUTHORITIES**

Ivana Kottasová, *Pfizer vaccine protection takes a hit as Delta variant spreads,
Israeli government says*, CNN (July 7, 2021), available at
https://www.cnn.com/2021/07/06/health/israel-pfizer-efficacy-delta-variant-
intl/index.html. ................................................................................................................. 14

Rice WM, Chudasama DY, Senyah F, Florence I, Thelwall S, et al., *Epidemiology
of COVID-19 in prisons, England, 2020*, Emerging Infectious Diseases 2021
Aug (June 22, 2021), available at https://wwwnc.cdc.gov/eid/article/27/8/20-
4920_article. ................................................................................................................... 14

Pursuant to Local Criminal Rule 32.1(c) and 18 U.S.C. § 3553(a), Defendant Ryan Kamada hereby moves the Court for a downward sentencing variance.

The facts of this case constitute a rare set of circumstances for the crime of obstruction. This is so because Ryan did not act with the purpose of obstructing justice; did not act with the intent to confer any benefit on himself; and did not foresee nor expect that, by warning his best friend, Geoff Chacon, to stay away from a drug dealer, he would obstruct an investigation. Ryan has lost everything. Once Weld County's first Asian-American judicial officer and the pride of his small-town community, he is now a disgraced and disbarred soon-to-be convicted criminal.

Ryan's daily life is filled with remorse, shame, and humiliation. He has taken full responsibility for his actions. He voluntarily resigned the bench, stipulated to disbarment by the Colorado Supreme Court, and has pled guilty to a federal felony. Ryan has cooperated with the government to mitigate the effects of his conduct. A devoted family man who strives to be a respected community member, he poses no risk to anyone. As his probation officer noted, "it is unlikely [Ryan] will ever face another criminal conviction in his lifetime."[1]

Given these unique circumstances, a sentence of three-years' probation is "sufficient but not greater than necessary" to comply with the goals of sentencing in 18 U.S.C. § 3553(a). This proposed sentence reflects the initial recommendation of the U.S. Probation Office in this case.[2] In the alternative, Ryan respectfully requests a sentence of one-year home confinement.

---

[1] (ECF No. 26-1, RR-4.)

[2] (ECF No. 26-1, RR-4.) Notably, Mr. Kamada, though his attorneys, has objected to the U.S. Probation Office's calculation of the advisory Guidelines range. (*See* ECF No. 19.)

## I.   **STANDARD OF REVIEW**

The U.S. Supreme Court has "instructed the district courts to treat the Guidelines as 'effectively advisory'" and has permitted them to "tailor the sentence in light of other statutory concerns as well," including imposing a below-Guidelines sentence where appropriate.[3]

The sentencing starting point is a calculation of the defendant's advisory Guidelines range.[4] But the Court "may not presume that the Guidelines range is reasonable."[5] It must go further. "Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."[6] These factors include the following relevant factors in this case: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant; and (4) the kinds of sentences available.[7]

The Court "must make an individualized assessment based on the facts presented."[8] "A downward variance is based simply on the district court's *discretionary authority* to . . . select a sentence sufficient, but not greater than necessary, to comply with all the purposes of sentencing."[9]

---

[3] *Pepper v. United States*, 562 U.S. 476, 490 (2011) (quoting *United States v. Booker*, 543 U.S. 220, 245 (2005)).
[4] *Gall v. United States*, 552 U.S. 38, 49 (2007).
[5] *Id.* at 50.
[6] *Id.* at 49-50.
[7] 18 U.S.C. § 3553(a)(2)(A)-(D).
[8] *Gall*, 522 U.S. at 50.
[9] *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018) (emphasis in original) (internal citations and quotations omitted).

## II.   **LEGAL ARGUMENT**

Set forth below are the relevant Section 3553(a) factors, as they apply in this case. For the following reasons, those factors warrant a sentence of three-years' probation, or, in the alternative, one year of home confinement.

### A.   **Ryan's History and Characteristics**

We begin with Ryan's background because having the "fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence."[10] A review of Ryan's life shows that, at bottom, he is a good man who—other than the regrettable events leading to his prosecution (discussed further below)—has led an honorable and law-abiding life devoted to hard work, obtaining a good education, providing for his family, and, although imperfect, doing his best to serve his community.



Ryan was born and raised in LaSalle, Colorado, a small town of less than 3,000 people. He is the father of two young children, Race (8) and Madden (4), and husband to Kayla Kamada, a

---

[10] *Pepper*, 562 U.S. at 480 (internal quotations and citation omitted).

nurse at the Colorado Children's Hospital. Ryan was the first in his family to graduate from college; he earned his undergraduate degree in mechanical engineering from the Colorado School of Mines and his law degree from the University of Denver. Ryan became an attorney and made a name for himself in Weld County through his civic engagement.

### 1. *Ryan's Upbringing and Family Background*

Being of service to others and loyalty to family and friends are values that were deeply instilled in Ryan as a young child. He grew up with two working parents and spent his weekends with his grandparents. Ryan is a third-generation Japanese-American with grandparents who both survived forced internment during World War II. Despite these circumstances, Ryan's grandfather and father both role-modeled being of service to family and community.

Ryan's grandfather, while interned, chose to enlist in the military to demonstrate his loyalty to the United States. After the war, he restarted in the Five Points neighborhood in Denver along with several other Japanese-American veterans. Every year, the men would come together, pool their money, and give it to one family to help them start a business.

Ryan's father was born in Denver and moved to LaSalle to start his own business. It was there that Ryan's family began breaking down Weld County's racial barriers: Ryan's parents married despite struggling to find a church that would marry an interracial couple, and, eventually, Ryan's father became the first Japanese-American mayor of LaSalle. He served as mayor for 10 years and then continued his service on various town boards.

Ryan's family, unsurprisingly, was devastated to hear of Ryan's prosecution, as well as his ensuing personal and professional downfall. They, to this day, are challenged to reconcile the man they have known since infancy with the person who engaged in the conduct Ryan by his own

admission did (albeit, without a full appreciation of its life-altering downstream consequences). Ryan is acutely aware of the great shame his conduct has brought on an otherwise sterling family name, as well as to his one-time court "family."

### 2. Community Service

Ryan continued his father's and grandfather's legacy of serving his community. In addition to serving as a judge, Ryan served on the boards of several non-profit foundations in Weld County, including the Northern Colorado Medical Center Foundation (raises funds for community health programs), the Greeley Transitional Home (provides temporary housing and support services for families experiencing housing instability), and Youth and Family Connections (provides services for Weld County youth engaged in high-risk behaviors), to name a few. Ryan also volunteered as a coach at local high schools and regularly provided *pro bono* legal services for members of his community in need. Civic engagement has long been a cornerstone of Ryan's being.

### 3. Ryan's Career

As an attorney, Ryan was well-respected for his work ethic and dedication to community. One of Ryan's former colleagues who practiced alongside him for over 13 years, wrote:

> Ryan is one of the hardest working attorneys I have ever met. He balanced that hard work with an unwavering commitment to his community and treated children and families with consideration, respect and kindness.

[Ex. A.] Ryan's belief in giving back to the community motivated him to seek a judgeship early in his career, while other lawyers were still focused on advancing their financial position. After only ten years as an attorney, Ryan in 2015 was appointed to serve as a magistrate judge.

One of Ryan's former law clerks, now an attorney in Weld County, remembers him as a positive, nurturing, and supportive mentor:

> Within days of working for Mr. Kamada, I felt confident that I had found a mentor who would prepare me for whatever obstacles would come my way. I was treated with the utmost respect and extended immeasurable support. I was allowed to make mistakes and be creative. Mr. Kamada went to bat for me in every way imaginable to assist me in achieving my goals. My second year as a guardian ad litem in my hometown community is now coming to a close, and I can say, unequivocally, that I would not be standing where I am without Mr. Kamada's support and engagement in my professional development.

[Ex. B.] Ryan's supervisor when he was a magistrate judge praised Ryan's work ethic and recommended his elevation to the district court in a letter to the Governor:

> I knew when I offered the magistrate position to Magistrate Kamada over three years ago that he would do an outstanding job; however, he has exceeded my lofty expectations in every way possible. He is thoughtful, intelligent, compassionate, decisive, and one of the hardest working people I know. He is universally liked and respected by everyone in the district. He is always one of the first persons to volunteer to assist others or serve on committees, and to take on additional responsibilities. Magistrate Kamada is very humble, too, and recognizes that we, as jurists, serve and work for the public. Having been raised in Weld County, he understands and embraces the diversity in our community.

[Ex. C.] In January 2019, Ryan became Weld County's first Asian-American judge and had the distinction of being one of the youngest diverse lawyers ever appointed to the bench in Colorado.[11]

Ryan ultimately found himself trapped between the world of his upbringing with his friends and the judiciary's requirement of unimpeachable character. Tragically, both for himself, but more importantly, for those he served, Ryan failed to treat the judicial canons with the reverence and respect required. The fact that he now finds himself a defendant in a federal criminal case is the most serious consequence of his immaturity and his misplaced sense of priorities.

4.      *Ryan's Cooperation with the Government*

A significant character consideration comes in the form of Ryan's day-one decision to provide, first local investigators and then the FBI and U.S. DOJ, a full and truthful accounting of

---

[11] Various former colleagues have written letters of support elegizing Ryan's career as a jurist and praising his commitment to rehabilitate himself. [Ex. D.]

his role in this offense—information which Ryan was uniquely positioned to supply, and that surely assisted the prosecution in making its charging decisions.[12] Ryan cooperated fully with the government because he wanted to confront what he did and take responsibility for his actions.

The government has opted to deny Ryan any substantive credit for cooperation, which of course is the government's prerogative. (Ryan in a sense was the victim of his own relative innocence—the only person about whom Ryan had any substantive information had already admitted his misconduct at the time the government first met with Ryan; while Ryan helped the government understand what he and Mr. Chacon did and knew, he had no relevant information about any ongoing narcotics conspiracy.)[13] That said, this Court is not constrained by the government's decision; though unable to grant a § 5K1.1. departure, it certainly can take Ryan's cooperation into consideration as it determines an appropriate sentence.[14]

## B.      The Nature and Circumstances of the Offense

The nature and circumstances of the offense consideration strongly favors Ryan.

### 1.      *It Is Undisputed That Ryan Intended No Harm and at No Time Expected His Information to Be Shared with Anyone Other Than Chacon*

This is one of the truly rare cases in which the defendant (1) did not act *with the purpose* of obstructing justice; (2) did not act with the intention of gaining any *material benefit* from his conduct; and (3) at the time of the offense, *did not foresee* that his conduct threatened to obstruct

---

[12] *See generally United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (holding that a sentencing court should consider, pursuant to § 3553(a)(1), the defendant's efforts to cooperate).

[13] Plea Agreement ¶ 23 ("*Unbeknownst to the Defendant*, Chacon shared the information the Defendant provided to him concerning the investigation with Drug Dealer. . . .") (emphasis added); ¶ 25 ("*Unbeknownst to the Defendant, but known by the Government*, the information the Defendant provided Chacon . . . caused Chacon and Drug Dealer to change their patterns of conduct and interfered with the WCDTF's investigation.") (emphasis added).

[14] *See generally United States v. Doe*, 218 F. App'x 801, 805 (10th Cir. 2007).

any investigation. Instead, Ryan, attempting to look out for his longtime childhood friend, acted recklessly but without malicious intent; he did not contemplate the impact his actions could or would have on any governmental activity. This offense, and this offender, in short, are not of a type that require incarceration.

Moving from the general to the specific, the record establishes that, although Ryan told his friend and mentee, Geoff Chacon, that Alberto Loya was the subject of a drug investigation, Ryan provided this information to Geoff *solely* to protect him so that he would stay away from Loya and not get caught up in the investigation.[15] It is similarly undisputed that Ryan received no benefit (and did not expect to receive any benefit) by providing Geoff this information.[16] Further, it is undisputed that Ryan (1) did not contact Loya regarding the investigation; and (2) believed Geoff would never share the fact of the investigation with Loya or anyone else.[17]

> 2.   *Ryan's Relationship with – and Loyalty to – His Best Friend Geoff Chacon Was a Critical Factor in His Downfall*

A critical aspect of this case is understanding the close personal relationship Ryan shared with Geoff Chacon. Only that helps explain why Ryan decided to do what he did.

---

[15] *See* Plea Agreement, ¶ 21 ("[Ryan], who at the time served as a personal and professional mentor to Chacon, was worried that, because of Chacon's past questionable associations and bad decisions (including reported cocaine use when Chacon was in high school), Chacon *might have fallen, or could fall, into bad habits*, including drug use and adultery.") (emphasis added); ¶ 22 (Ryan was motivated "to protect his friend Chacon from reputational harm" and "potential criminal legal exposure flowing from Chacon's relationship . . . with [Loya].").

[16] (ECF No. 17-1, at R-3 ("[I]t appears [Ryan] was more so looking out for his friend, so he did not get caught up in the investigation.").)

[17] *Id.* at ¶ 26 (the parties agree that Ryan had no contact with Loya "concerning the investigation or anything else;" Ryan, moreover, "assumed Chacon *would not share* this sensitive information with [Loya] or anyone else. . . .") (emphasis added); (ECF No. 17-1, at R-3 (the probation office likewise found that "[t]o [Ryan's] credit, he does not appear to have known that his friend was repeating the information to the person under investigation.").)

Ryan and Geoff grew up together in LaSalle and attended the same high school. Approximately six years ago, Ryan reconnected with Geoff. After struggling to find his footing in a career, Geoff became a schoolteacher and basketball coach. Geoff and Ryan quickly became inseparable friends: Their wives became close, Geoff and his wife became *de facto* second parents to Ryan's oldest child Race, and Geoff's parents provided daycare for Race. Geoff and Ryan texted daily and saw each other almost every week. Race often spent the night at Geoff's house. Ryan trusted Geoff sufficiently to select him to be Race's emergency contact for his school.

When Ryan's father required full-time nursing care, Geoff and his brothers would take turns eating meals with Ryan's father to help Ryan keep his promise that his father would never eat a meal alone. Ryan also acted as a mentor to Geoff: When Geoff decided to seek a promotion, Ryan helped, reviewing his resume and cover letter, practicing interviews with him, and even writing letters of recommendation. Ryan took it upon himself to help Geoff succeed.

It never occurred to Ryan that his best friend—a middle school principal, a father, a husband to a responsible wife, and Race's emergency contact—could be part of a significant criminal enterprise. To the contrary, Ryan believed that Geoff merely was "casual[ly] associate[d]" with Loya.[18] As the government itself has conceded, Ryan had no reason to suspect that Geoff had any stake in the outcome of the investigation into Loya.[19]

Ryan's lack of knowledge is borne out by his behavior: Had Ryan intended to obstruct the investigation or monitor law enforcement's activities into Loya, he personally would have handled the warrant and any follow-up activities, rather than voluntarily and immediately passing it off to

---

[18] *See* Plea Agreement, ¶ 21.
[19] Plea Agreement, ¶ 26 (the parties agree that Ryan "assumed Chacon *would not share* this sensitive information with [Loya] or anyone else. . . .") (emphasis added).

another judge.[20] As explained in the plea agreement, Ryan's *sole intent* in disclosing the information to Geoff was to protect him from any reputational harm and potential criminal exposure that could come from being "casual[ly] associate[d]" with a person under investigation.[21]

Although there is no doubt that Ryan's actions (including some of what he thought would be private communications with his "childhood buddies") were tremendously improper and reflected exceptionally poor judgment, both the government and the probation officer agree that Ryan never acted *with the purpose* of obstructing the Weld County Drug Task Force ("WCDTF") investigation. We are, of course, mindful that Ryan pled guilty to sharing information "intentionally and corruptly," but all parties agree that his conduct (meeting the absolute "low end" of the relevant *scienter* requirement) was "inappropriate and reckless" and that Ryan "reasonably should have foreseen" the consequences of his actions.[22]

In the typical obstruction case, the defendant's purpose is to obstruct.[23] Ryan's actions here stand apart because it is undisputed that he did not know, or even subjectively anticipate, that the information he was sharing with his friend would be passed on or would result in any form of

---

[20] *See id.* at ¶ 19 ("[Ryan] decided to recuse himself and asked the WCDTF [officer] to submit the warrant to a different judge. [Ryan] never reviewed, read, or viewed the subject search warrant.").
[21] *Id.* at ¶¶ 21-22.
[22] *See* Plea Agreement, ¶ 26.
[23] *See, e.g., United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020) (fleeing the country in defiance of a court order and engaging in international parental kidnapping); *United States v. Gray*, 692 F.3d 514 (6th Cir. 2012) (fabricating official reports regarding the death of an inmate and lying to investigators regarding the events leading to the death); *United States v. Atl. States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180 (D.N.J. 2009) (directing a witness to commit perjury and falsifying federal forms related to a gun sale in order to assist an individual under investigation); *United States v. Bishop*, 493 F. App'x 984 (10th Cir. 2012) (unpublished) (intentionally submitting falsified documents to the court as part of a sentencing proceeding).

obstruction. This distinction separates Ryan's conduct from more serious forms of obstruction and warrants a downward variance. Indeed, we are unaware of a single case with similar facts.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for Law, and Provide Just Punishment for the Offense

The Tenth Circuit has recognized that circumstances such as (1) the defendant's loss of his profession and (2) the impact of sentencing on the defendant's family, are valid factors for sentencing courts to consider in determining whether the sentence adequately promotes respect for law and provides just punishment for the offense.[24]

Although Ryan's offense is undoubtedly serious, we respectfully submit that a sentence of probation, or, in the alternative, home confinement, would adequately promote respect for the law and provide just punishment. This is because Ryan already has paid an outsized financial, reputational, and emotional price for the poor choices he made beginning with a phone call one morning over two years ago. Given these significant and undeniable collateral consequences, a sentence of incarceration simply is not necessary to satisfy any statutory goal of sentencing.

As the primary provider for his family, Ryan (no longer a licensed lawyer) struggles to support himself, his wife, his in-laws and mother, and his two young children, let alone save for his children's education. Ryan's felony conviction will permanently impact his employment opportunities for the rest of his life. Indeed, Ryan's disbarment has been finalized and the details of his criminal conduct, as well as his private shortcomings, have been detailed in his public censure. In addition, Ryan's conviction has garnered significant attention in his small community.

---

[24] *See Barnes*, 890 F.3d at 919.

Ryan and his family have been publicly shamed and humiliated by publication of his story in both his hometown newspaper and throughout Colorado. Once a very social and involved member of his community, Ryan by all accounts has largely disappeared from the community that he served wholeheartedly for over 20 years. He has gone from a small-town hero to a disgraced and disbarred convicted criminal. The distance he has fallen is itself a profound punishment.[25]

Ryan, in short, is a devastated young man who understands that his crime necessitates punishment, and that he, in fact, deserves the substantial informal penalties he has received during the time this case has been pending. However, given Ryan's lack of intent to substantively obstruct the WCDTF investigation, his remorse, his cooperation, the extenuating circumstances discussed herein, and his responsibility for the financial and emotional well-being of his family, a sentence of probation or home confinement would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant

#### 1. General Deterrence

The investigation and prosecution of this case over the past two years has generated massive publicity in Greeley County and in the State of Colorado generally. The *Denver Post*, the *Colorado Sun*, and the *Greeley Tribune*, among other publications, have covered this case. The general public is well aware that Ryan stepped down from the bench in disgrace, pled guilty to a federal felony, and was publicly disbarred by the Colorado Supreme Court. Further, the general

---

[25] *See United States v. Courtney*, 76 F. Supp. 3d 1267, 1303 (D.N.M. 2014) ("That [defendant] has already been seriously reputationally punished reduces the need for the Court to impose further punishment and puts downward pressure on the sentence.").

public is necessarily aware that, as a result of this case, Ryan's prominent and promising career in public service is over and that his reputation is in tatters. The general public also knows, through press coverage, that parties that once appeared before Ryan are now calling into question his rulings and requesting independent review of his decisions.

We respectfully submit that the public's knowledge of Ryan's downfall will provide substantial general deterrence. The public will plainly understand that obstruction crimes, even where the defendant did not act with the purpose of obstructing the investigation and where he received no benefit whatsoever from his conduct, can lead to personal and professional ruin. A sentence of incarceration is not required to serve any general deterrence objectives.

2.   <em>Specific Deterrence</em>

There is no need to impose a custodial sentence to achieve specific deterrence objectives. The U.S. Probation Office's Sentencing Recommendation, in arguing this Court should grant a downward sentencing variance, noted that, in their professional opinion, Ryan "has performed well under pretrial release and does not present with serious community safety concerns. Regarding specific deterrence, ***it is unlikely he will ever face another criminal conviction in his lifetime***."[26]

**E.     The Kinds of Sentences Available**

Because the Guidelines are now advisory, the sentencing table and the restrictions on probationary sentences, sentences of home confinement, and split sentences in U.S.S.G. § 5A, 5B1, and 5C1 are also advisory.[27] Thus, to receive a sentence of probation, the defendant does not have to come within Zones A or B, and to receive a split sentence, the defendant does not have to

---

[26] (ECF No. 26-1, RR-4 (emphasis added).)

[27] *See Gall*, 552 U.S 38, 50 (holding that a sentencing court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented.").

come within Zone C.[28] To the extent this Court is not inclined to sentence Ryan to probation, it could certainly order community service and/or home confinement as alternatives to imprisonment. Although the Guidelines recommend a custodial sentence, there is no reason to impose such a severe sentence on Ryan under the truly unique circumstances present here.

### F.   The Global Pandemic, Coupled with Ryan's Medical Condition, Reinforces the Necessity for a Non-Custodial Sentence

Ryan suffers from two preexisting medical conditions that make him more susceptible to contracting COVID-19 as well as placing him at higher risk of complications and death should he contract it.[29] A recent study published by the U.S. Centers for Disease Control and Prevention concluded that "[i]ncarcerated persons are at an increased risk for [SARS-CoV-2] transmission and illness because of both the prison environment and the vulnerability of the residents."[30] Indeed, even fully vaccinated individuals face significant risk if they are incarcerated. According to Israel's Ministry of Health, the Pfizer-BioNTech coronavirus vaccine is only approximately 64% effective against the Delta variant, which is currently the most common variant of COVID-19 in the U.S.[31]

In addition to costing taxpayers significant resources to care for Ryan's liver and heart conditions if he is incarcerated, both illnesses could ultimately make incarceration during a

---

[28] *See id.*

[29] (*See* ECF No. 26, ¶¶ 70-71 ("The defendant reported being diagnosed with Fatty Liver Disease" and "having high cholesterol").)

[30] Rice WM, Chudasama DY, Senyah F, Florence I, Thelwall S, et al., *Epidemiology of COVID-19 in prisons, England, 2020*, Emerging Infectious Diseases 2021 Aug (June 22, 2021), available at https://wwwnc.cdc.gov/eid/article/27/8/20-4920_article.

[31] Ivana Kottasová, *Pfizer vaccine protection takes a hit as Delta variant spreads, Israeli government says*, CNN (July 7, 2021), available at https://www.cnn.com/2021/07/06/health/israel-pfizer-efficacy-delta-variant-intl/index.html.

pandemic a death sentence for Ryan. The Sentencing Guidelines contemplate the defendant's medical condition as a compelling reason for a sentence reduction.[32]

### G.      The Court Should Not Impose a Fine

Under the advisory Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."[33] As a relatively young attorney who dedicated his life to public service and came from a family with modest means, Ryan has not had any financial safety net upon which to rely. Having lost his bar license, he no longer has any remunerative professional opportunities.

To make ends meet, Ryan's mother-in-law had to sell her house and move in with Ryan and his wife, Kayla, to help them pay the mortgage on their house. To compound the financial hardship, Ryan is no longer able to afford daycare for his children and must stay home to look after them. The COVID-19 pandemic led Ryan's mother-in-law to lose her job, exacerbating the dire household financial situation. Ryan's attorneys in this case are representing him *pro bono*, as he does not have the financial means to pay their rates. Accordingly, Ryan's financial situation renders any imposition of a fine "greater than necessary" to achieve statutory sentencing purposes.

## III.      <u>CONCLUSION</u>

Ryan has suffered immensely for his crime. This Court satisfies the goals of the Sentencing Guidelines and the requirements of justice by sentencing Ryan to a lengthy period of probation, or, in the alternative, one year of home confinement, without the need for incarceration.

---

[32] *See* U.S.S.G. § 1B1.13; *United States v. Perry,* 473 F. Supp. 3d. 1250, 1254 (D. Colo. 2020) ("[T]he Court must balance this need for just punishment against the risk that COVID-19 poses to Mr. Perry's health, given his age and serious underlying health conditions.").
[33] U.S.S.G. § 5E1.2(a).

DATED this 14th day of July, 2021.

Respectfully submitted,

**PERKINS COIE LLP**

By: _s/ Michael L. Bender_
    Michael L. Bender (SBN CO 3479)
    T. Markus Funk (SBN CO 43500)
    1900 Sixteenth Street, Suite 1400
    Denver, Colorado 80202-5255
    Telephone: 303.291.2300
    Facsimile: 303.291.2400
    MBender@perkinscoie.com
    MFunk@perkinscoie.com

Attorneys for Defendant RYAN KAMADA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2021, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following e-mail

addresses:

- **Bryan David Fields**
  bryan.fields3@usdoj.gov
- **John Patrick Taddei**
  john.taddei@usdoj.gov

<u>*s/ Michael L. Bender*</u>
Michael L. Bender (SBN CO 3479)
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400
MBender@perkinscoie.com

Attorneys for Defendant RYAN KAMADA