IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  1:20-cr-00174-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **RYAN KAMADA,**

    Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR DOWNWARD VARIANCE

Sentencing the defendant to probation, or confining him to his home for a year, would undermine, rather than promote, the purposes of criminal sentencing set forth at 18 U.S.C. § 3353(a).  Contrary to the defendant's proffered reasons for a variance, he *did* act with the purpose of obstructing justice and *did* seek a material benefit: insulating his best friend from law enforcement scrutiny.  It was also foreseeable to the defendant that his offense conduct would cause more wide-ranging damage to the Weld County Drug Task Force's ("WCDTF") investigation, the operations and stature of his former court, and the justice system the defendant had sworn to serve.  Moreover, most of the remaining arguments that the defendant proffers are available to him only by virtue of his privileged positions as a lawyer and judge and therefore present weak or improper bases for varying downward.

For the reasons set forth more fully below, the government respectfully

1

requests that the Court deny the Defendant's Motion for Downward Variance, ECF No. 35 (the "Variance Mot."), and impose a sentence of 21 months' imprisonment, which is at the bottom of the advisory Sentencing Guidelines range. Such a sentence would adequately address the mitigating circumstances set forth in the defendant's motion while avoiding the kind of unwarranted disparity that the Guidelines are designed to prevent. *See United States v. Boucher*, 937 F.3d 702, 713-14 (6th Cir. 2019) (explaining why wide variances deserve closer appellate review to avoid unjustified disparities).

## I. The Defendant's Privileged Background and Professional Characteristics do not Warrant an Exceptional Variance

The defendant should not get a white-collar discount at sentencing. The government does not question the accuracy of the facts proffered in sections II.A.1., 2., or 3. of the Variance Motion. But the personal characteristics the defendant highlights are true of almost every professional who stands before a federal judge for sentencing. Using them as justification for an exceptional variance would, in effect, mean that judges and lawyers — simply by virtue of characteristics they generally share as a class — deserve lower sentences that those who do not occupy such lofty social positions. Such an outcome, contrary to the conclusions set forth in Section II.C. of the Variance Motion, would be improper and unjust for at least five reasons:

First, the sentencing statute, 18 U.S.C. § 3553(a) directs the Court to consider whether the *sentence* imposed satisfies certain goals. Reputational harms and professional sanctions are not the sentence. As the defendant himself seemed

to recognize (Variance Mot. at 11), they are the foreseeable "collateral" consequences that arise from failure to meet expected professional standards. Consequences like these simply place the defendant in the position of a normal citizen standing before this Court who had never experienced the privileges that come with a professional license and a vaunted public position. A hypothetical "street" criminal would not get a lower sentence because of the loss of professional stature. Why should a lawyer and former judge — who abused his training and status to commit serious crimes — be able to use that status to argue for a lower sentence than someone who did not possess such advantages and privileges?

Relying on these extra-legal, "informal penalties," Variance Mot. at 12, to justify a lower sentence is thus improper. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 444 (10th Cir. 2015) (unpublished) (reversing sentence, in part, based on procedural error in relying on such "collateral consequences" and citing numerous courts of appeals expressing a dim view of such rationales because they "impermissibly favor criminals . . . with privileged backgrounds"). Such an outcome, far from achieving justice, reinforces the substantial structural injustices at work in our society. *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013) (explaining that a lesser sentence based on "humiliation before his community, neighbors, and friends — would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along those lines.") (citation omitted); *Morgan*, 635 F.App'x at 445 (describing Sixth Circuit's opinion related to lenient sentence for accountant in *United States v. Musgrave*, 761

3

F.3d 602, 604 (6th Cir. 2014), and noting that in reversing that sentence, "the Sixth Circuit saw it for what it was, favoritism of the elite").

The defendant cites *United States v. Barnes*, 890 F.3d 910 (10th Cir. 2018), for the proposition that loss of a profession and the impact of sentencing on family are "valid" reasons for a variance.  Variance Mot. at 11 & n.24.  It would be more accurate to say that the Tenth Circuit panel in *Barnes* found the variance to be questionable — the two judges in the majority were "confident [they] would have imposed higher sentences" to the defendant correctional officers convicted of assaulting prisoners in jail — but not an abuse of discretion.  *Barnes*, 890 F.3 at 921.  Furthermore, in dissent, Judge Bacharach wrote that he would have held that the variance sentence the district court imposed was substantively unreasonable.  *Id.* at 934 (Bacharach, J., dissenting).  These opinions are a far cry from the *Barnes* panel saying that the district court's reasons were "valid."  The government submits that cases like *Morgan* are a better guide to deciding the merits of the defendant's request for such a drastic variance.

Second, the Guidelines were created, in part, to help address the concern that white-collar offenders received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses."  S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260.  A sentence outside the Guidelines range would create disparities with other types of offenders — such as drug dealers who obstruct criminal investigations — that would simply reinforce this perception of special treatment and thus undermine deterrence and respect for the law.  *United*

4

*States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (explaining that lower sentences for white collar criminals contradict the purpose of the Guidelines), *reversed on other grounds by D'Amico v. United States*, 522 U.S. 1173 (2008).

Third, the defendant's privileged position as a judge and lawyer makes him *more*, not less culpable. "Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). The defendant was not a drug dealer on the street in desperate need of cash. Rather, the defendant's crime was one of selfishness, borne from an opportunity he had solely due to his professional success. He should not be treated *less* harshly than a "corner dealer" because he was fortunate to have the support and innate talent necessary to become a lawyer and judge. *See id.* (stating that there should be no "'middle class' sentencing discounts"). Furthermore, the defendant and several supporting letters repeatedly cite his "immaturity," Variance Mot. at 6, as an explanation for his conduct. That explanation falls short given, by the time of the defendant's criminal conduct in January 2019, he was 40 years old, has been a lawyer for almost 15 years, and had been a judge for five years.

Fourth, the government does not question the defendant's love for his family

5

and their love and support for him.  But that does not distinguish him from many other defendants and should not be the basis for a sentence outside the Guidelines range.  Similarly, the government does not question his prior community service.  But using community service to escape later punishment cheapens that service into a sort of cynical social indulgence that a person can redeem at a later date to get out of trouble.  *See United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) (noting that "[c]haritable giving and community service are discouraged factors for departure under the Guidelines, U.S.S.G. § 5H1.11; and we expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses").  It is not a valid basis for a variance.  *See United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) ("Defendants accused of comparable frauds often have impressive records of civic and philanthropic accomplishments. These good deeds in no way lessen the harm suffered by the victims of their crimes, and in some ways they render the crimes themselves all the more puzzling and deplorable.").

Finally, the defendant's "cooperation" with the government amounts to accepting responsibility for his crime.  The recommended Guidelines Range already credits him for this with a three-level reduction in his offense level.  The government, too, believes this is worthy of consideration, which is among the reasons it recommends a sentence at the bottom of the Guidelines range.

## II.     The Defendant is Discounting the Seriousness of His Offense

This case is "truly rare" only in that the defendant's breach of his oath and

6

betrayal of his colleagues are so exceptional. The facts in the plea agreement are sufficient to show, contrary to what he now proffers in sections II.B.1. and 2. (Variance Mot. at 7), that (1) he *did* act with the purpose of obstructing justice; (2) he *did* seek a material benefit; and (3) it was foreseeable that his conduct would obstruct.

### A. The Defendant Purposefully Obstructed Justice when He Corruptly Abused his Office to Help a Personal Friend

The defendant asserts "it is undisputed that he did not know, or even subjectively anticipate that the information he was sharing with his friend would be passed on or would result in any form of obstruction." Variance Mot. at 10-11. The problem with this formulation is that it conflates two separate issues: (1) whether the defendant could subjectively anticipate that his friend would pass on the information; and (2) whether giving Chacon the search warrant information "would result in any form of obstruction." The government disputes the defendant's characterization of both. It will address the second assertion here and the first assertion below in Part II.C., *infra*.

The second assertion — the one that he did not know he would obstruct justice or, in other formulations, had no purpose to obstruct justice — is the most unfathomable. The defendant pleaded guilty to "corruptly and intentionally endeavor[ing] to influence, obstruct, or impede" a federal agency proceeding. ECF No. 14 at ¶ 5.c. He admitted that he was "motivated to protect Chacon from potential criminal legal exposure flowing from Chacon's relationship and potential unlawful dealings with Drug Dealer" and that "[h]is sharing of the information was

7

thus done intentionally and corruptly." *Id.* at ¶ 22.

The defendant cannot, consistent with the plea agreement and his statements under oath at the plea hearing, now say that he was subjectively unable to anticipate that his actions would result in *any* form of obstruction. He admits this, and is "mindful" of it, but nevertheless asserts that he can somehow have done this "intentionally and corruptly," but not "with the purpose" of obstructing the WCDTF investigation. Variance Mot. at 10. It is caviling to say that this was done "intentionally and corruptly," but not "purposely." The Court should ask the defendant to explain any meaningful legal distinction between the two — especially when he is asking the Court to put enough weight on the distinction to avoid any period of incarceration.

### B. The Defendant Used His Office in Pursuit Immense Personal Benefit

It is similarly dissonant for the defendant to explain that he committed his crime because of his life-long friendship with Geoffrey Chacon, but then to also say that the defendant "did not act with the intention of gaining any *material benefit* from his conduct." Variance Mot. at 7. The government incorporates here its earlier response to the defendant's similar objection to the Guidelines. Using his position to save his best friend from the devastating effects of a criminal investigation was leveraging his office to seek immense personal benefit. ECF No. 24 at 6-7. It weighs *against* a variance and not in favor of one.

### C. It Was Foreseeable to the Defendant That His Conduct Would Obstruct the Broader WCDTF Investigation

The defendant's argument that he did not *subjectively* foresee that Chacon would further share the information with Drug Dealer or his confederates, or that he did not *subjectively* anticipate that his conduct would result in any form of further obstruction to the WCDTF's investigation, speciously conflates *mens rea* with collateral consequences. Those are distinct parts of a criminal offense and the measure of each weighs in favor of the government's recommended sentence of 21 months.

The defendant admitted that he *subjectively* acted intentionally and corruptly when he gave information to help his friend Chacon avoid criminal exposure. ECF No. 14 at ¶ 22. For all of the reasons set forth in the government's sentencing statement, the nature and circumstances surrounding this intentional criminal act — circumstances that show a consistent and cavalier corruption of his office — weigh in favor of the government's recommended sentence. ECF No. 34 at 4-10.

The defendant further admitted that he "reasonably should have foreseen that, given Chacon's known acquaintance with Drug Dealer, Chacon would share this information with him." ECF No. 14 at ¶ 26. To the extent the defendant is seeking to downplay or minimize the objective foreseeability of his actions, the government incorporates by reference here the arguments in the briefing over whether he should receive a mitigating role reduction under the Guidelines. ECF No. 25 at 4 ("The government disputes any characterization of the facts as suggesting that a sitting state court judge could lack subjective knowledge of the

9

corrosive nature of an obstruction crime.")  The defendant could have anticipated that his friend's "past questionable associations and bad decisions" would manifest themselves in similarly questionable associations and bad decisions regarding the information he provided.  ECF No. 14 at ¶ 21.

If the defendant is arguing that he should get a lower sentence because he did not *subjectively* wish for all of the natural and foreseeable consequences of his actions, the Court should treat the case like it would any other in which a person's criminal conduct selfishly and intentionally shifts unwanted and unreasonable risks to innocent third parties.  The issue is not whether the defendant "*subjectively* anticipate[d] the information he was sharing with his friend would be passed on or would result in any form of obstruction."  Variance Mot. at 10.  The issue is whether he should be criminally punished for abusing his office by indulging his subjective preferences in a way that imposed additional risks on others, including dedicated law enforcement officers unaware that their investigation had been compromised.

### III. Probation or Home Confinement for a Gross Abuse of Public Office Would Undermine Deterrence and Respect for the Law

The defendant abused his office and, as a result, no longer holds it.  The privilege of a law license was predicated on his promise to follow the ethical rules that justified that privilege.  He broke that promise and no longer has a law license.  These are the *bare minimum* consequences the public would expect in these circumstances.  The public would view a sentence of probation, or to twelve months in a comfortable home, as another example that the powerful are held to a different, more lenient standard.  The public will see that when people in positions of

considerable authority abuse their office to help their close friends avoid criminal investigation — an opportunity not remotely available to an average citizen — the substantial pre-existing advantages and privileges that allowed them to achieve that power in the first place also insulate them from the forms of punishment that are meted out to others without them. *See United States v. Sample*, 901 F.3d 1196, 1200-01 (10th Cir. 2018) (citing cases and Congressional findings supporting the deterrent effect of prison on white collar crime, ordering resentencing where district court imposed lenient sentence on a white-collar defendant, and noting that courts imposing such sentences "raise concerns of sentencing disparities according to socio-economic status") (internal quotation marks and citation omitted).

This effect would be aggravated by the drastic nature of the variance sought by the defendant here. Indeed, such a variance would discount not just this § 3553(a) factor, but many of the others the Court must consider. As Judge Holmes explained in his concurring opinion in *Morgan*, a sentence of probation is *qualitatively* different than a sentence of imprisonment. Such sentences effectively accord *no* weight to general deterrence, the seriousness of the crime, the need to promote respect for the law, or the need to provide just punishment. 635 F. App'x at 461 (Holmes, J., concurring). Thus, to obtain such a variance, the defendant should have to explain why these factors deserve no weight in this case or, at the very least, why other factors lean so heavily in favor of probation.

## IV. There is Nothing Special About Sentencing in this Case, as Opposed to Others Conducted During the Pandemic, Supporting a Variance.

The defendant's recitation of his medical history is incomplete: he says that

11

he is at risk, but does not say whether he has taken the opportunity to vaccinate himself to mitigate those risks. The sources he cites in support of his argument also elide the availability of vaccines. The Rice study cited in footnote 30 concerns cases of the disease through October 12, 2020 — the Pfizer and Moderna vaccines did not get Emergency Use Authorization until December 2020. The CNN article cited in footnote 31 notes in its second paragraph that the Pfizer vaccine, in particular, is 93% effective in preventing severe disease and hospitalization. Later on, a prominent public health expert is quoted as saying that the results of the Israel data are "actually encouraging information, that these vaccines are still highl[y] effective in terms of preventing hospitalizations, severe illness, and death." Ivana Kottasová, Pfizer vaccine protection takes a hit as Delta variant spreads, Israeli government says, CNN (July 7, 2021), available at https://www.cnn.com/2021/07/06/health/israelpfizer-efficacy-delta-variant-intl/index.html (last accessed on July 17, 2021).

Other studies and sources of information continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against

12

severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA. Pfizer and BioNTech Confirm High Efficacy and No Serious Safety Concerns Through Up to Six Months Following Second Dose in Updated Topline Analysis of Landmark COVID-19 Vaccine Study, Businesswire (April 1, 2021), available at https://www.businesswire.com/news/home/20210401005365/en/ (last accessed on July 20, 2021).

A study issued on April 28 and reported by the CDC found that the efficacy rate of the Pfizer and Moderna vaccines was the same (approximately 94%) in the population over the age of 65 as in the population of adults as a whole, showing the effectiveness of the vaccines even in a group that is particularly vulnerable to severe outcomes. Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention (May 7, 2021), available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7018e1.htm?s_cid=mm7018e1_w (last accessed on May 2, 2021).

Finally, the defendant does not provide any detail regarding the severity of his medical conditions, explain why or how BOP is unable to adequately safeguard his health, or otherwise justify the conclusion that his conditions are so extraordinary and compelling as to warrant release. *Cf. United States v. Garrison*, No. 14-cr-231-WJM, 2021 WL 2633426, at *2 (D. Colo. June 25, 2021) (Martinez, J.) (noting that the weight of authority counsels against release where there are no documented cases at a facility and noting the development of the "highly effective vaccines for COVID-19").

## V. CONCLUSION

For these reasons, as well as those set forth in the government's Sentencing Statement, ECF No. 34, the Recommended Sentence of 21 months' imprisonment is sufficient but not greater than necessary to accomplish the goals of criminal sentencing in this case.

Respectfully submitted this 21st day of July, 2021.

|  |  |
|---|---|
| MATTHEW T. KIRSCH<br>Acting United States Attorney | COREY R. AMUNDSON<br>Chief |
| By: *s/Bryan David Fields*<br>Bryan David Fields<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>1801 California St., Ste. 1600<br>Denver, CO 80202<br>Telephone: 303-454-0200<br>Fax: 303-454-0406<br>E-mail: Bryan.Fields3@usdoj.gov<br>Attorney for Government | By: s/ *John P. Taddei*<br>John P. Taddei<br>Trial Attorney<br>U.S. Department of Justice<br>Public Integrity Section<br>1301 New York Ave. NW, Ste. 1000<br>Washington, DC 20530<br>Telephone: 202-514-1412<br>Fax: 202-514-3003<br>Email: John.Taddei@usdoj.gov<br>Attorney for Government |

Case 1:20-cr-00174-WJM   Document 43   Filed 07/21/21   USDC Colorado   Page 15 of 15

## CERTIFICATE OF SERVICE

    I certify that on this 21st day of July, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case

                                          s/ *Bryan David Fields*
                                          BRYAN DAVID FIELDS
                                          Assistant United States Attorney
                                          1801 California Street, Suite 1600
                                          Denver, CO 80202
                                          Telephone 303-454-0100
                                          Facsimile 303-454-0402
                                          Bryan.Fields3@usdoj.gov